**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 15-2099**

———————

STATOIL USA ONSHORE PROPERTIES INC.,

        Plaintiff - Appellee,

    v.

PINE RESOURCES, LLC,

        Defendant - Appellant.

———————

Appeal from the United States District Court for the Southern
District of West Virginia, at Charleston. Irene C. Berger,
District Judge. (2:14-cv-21169)

———————

Argued: October 26, 2016        Decided: January 18, 2017

———————

Before MOTZ, TRAXLER, and FLOYD, Circuit Judges.

———————

Vacated and remanded by unpublished per curiam opinion.

———————

**ARGUED:** David Allen Barnette, JACKSON KELLY, PLLC, Charleston,
West Virginia, for Appellant. Constance Hankins Pfeiffer, BECK
REDDEN LLP, Houston, Texas, for Appellee. **ON BRIEF:** Vivian H.
Basdekis, JACKSON KELLY, PLLC, Charleston, West Virginia, for
Appellant. Fields Alexander, Joel T. Towner, BECK REDDEN LLP,
Houston, Texas; Bridget Furbee, Bridgeport, West Virginia, John
J. Meadows, STEPTOE & JOHNSON PLLC, Charleston, West Virginia,
for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In 2008, Appellant Pine Resources, LLC ("Pine"), sold certain mineral rights to non-party PetroEdge Energy, LLC ("PetroEdge"), pursuant to the terms of a purchase and sale agreement (the "Pine PSA"). In 2012, PetroEdge sold its mineral rights to Appellee Statoil USA Onshore Properties, Inc. ("Statoil"), pursuant to the terms of a second purchase and sale agreement (the "Statoil PSA").

In 2014, Statoil sought a declaratory judgment that it was not in breach of the Pine PSA, and had no obligations under that agreement to Pine other than to pay certain royalty interests. Pine filed a breach of contract counterclaim, seeking damages for Statoil's alleged nonperformance of spudding obligations outlined in Section 5.7(b) of the Pine PSA. The parties filed cross-motions for summary judgment.

The district court granted summary judgment to Statoil, and denied Pine's motion for summary judgment on its counterclaim. The court held that, under the unambiguous language of the Pine PSA, the agreement's spudding obligations extended only to the "Purchaser," which the court read to mean PetroEdge alone.

This holding, however, renders effectively meaningless a successors and assigns provision in the Pine PSA. It is our duty to read a contract as a whole, giving meaning to every provision whenever possible. Because the district court failed

to properly do so, we vacate its judgment and remand for further proceedings.

I.

A.

In 2001, Pine acquired mineral interests in a 565-acre tract of land in Barbour County, West Virginia (the "Property"). In 2008, at a price of $479,876, and pursuant to the terms of the Pine PSA, non-party PetroEdge purchased from Pine the Marcellus Mineral Rights on the Property.[1]

The Pine PSA--drafted by PetroEdge--contains the following relevant provisions:

- <u>Introduction</u>: The Pine PSA states in its introductory paragraph that it is an agreement "by and between Pine Resources Inc., a West Virginia corporation ('Seller'), and PetroEdge Energy LLC, a Delaware limited liability company ('Purchaser')." J.A. 49. The Pine PSA further provides that "Seller and Purchaser are sometimes referred to herein together as the 'Parties' and individually as a 'Party'." <u>Id.</u>

---

[1] The Marcellus Mineral Rights include, inter alia, hydrocarbon mineral interests of "those subsurface depths from the base of the Elk formation to the base of (and including) the Onondaga formation." J.A. 50.

- <u>Article 5</u>: Article 5 outlines the covenants of the parties, and centers on their mineral production plans. Section 5.5 calls for quarterly meetings by the "Parties" to discuss drilling plans and operations. J.A. 56. Section 5.6 enjoins cooperation between the "Parties" in the event of parallel drilling or operations. <u>Id.</u> Section 5.7(a) requires "Purchaser [to] apply for a meter tap on a gas transmission line" within 60 days of executing the Pine PSA. J.A. 56–57. Section 5.7(b) provides that the "Purchaser shall spud not less than one (1) well on the Contract Area" within a year of the installation of the meter tap; it further provides that the "Purchaser" shall have spudded at least three wells within five years of the meter tap's installation. J.A. 57.[2] Section 5.8 discusses the scenario where a party abandons a well and the non-abandoning party gets the right to take over its operation. <u>Id.</u> Section 5.9(a) discusses Pine's 18% retained overriding royalty interest on hydrocarbons produced from the Marcellus Mineral Rights. J.A. 57–58. Section 5.9(b) establishes an arbitration procedure for disputes between the "Seller"

---

[2] After multiple delays and a purchased extension, PetroEdge drilled one well, the Bumgardner 5-2H, in December 2011.

and the "Purchaser" over the occurrence of a "Production Termination Event." J.A. 58.

- Article 7: Article 7 is the Pine PSA's "Indemnification; Limitations" section. J.A. 60-62. As relevant here, Section 7.2(a), provides as follows:

  > [1] The representations and warranties of the Parties in Articles 3 (except Section 3.7) and 4 and the covenants and agreements of the Parties in Article 6 [sic] (except Sections 5.4 through 5.9) shall survive the Execution Date for a period of two (2) years. [2] The representations, warranties, covenants and agreements of Seller in Sections 3.7 and 5.4 shall survive until the close of business 30 days after the expiration of the applicable statutes of limitation (including any extensions thereof) provided that any proceeding or indemnification claim pending on the date of any such termination shall survive until the final resolution thereof. [3] The remainder of this Agreement shall survive the Execution Date so long as Purchaser holds any interest in the Mineral Rights. Representations, warranties, covenants and agreements shall be of no further force and effect after the date of their expiration, provided that there shall be no termination of any bona fide claim asserted pursuant to this Agreement with respect to such a representation, warranty, covenant or agreement prior to its expiration date.

  J.A. 61.

- Article 8: Article 8 contains the remaining miscellaneous provisions. Section 8.5 instructs that the Pine PSA is to be construed in accordance with West Virginia law. J.A. 63. Section 8.8 contains a successors and assigns provision, which in relevant part provides that "this

5

Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns." Id.

- Deed: Pine's deed to PetroEdge (the "Deed") granting the latter the Marcellus Mineral Rights is an exhibit attached to the Pine PSA. (All exhibits to the Pina PSA were expressly incorporated under Section 8.9, the integration clause of the Pine PSA. J.A. 63.) Article III of the Deed provides that, "[n]otwithstanding anything to the contrary," Pine reserves an 18% retained overriding royalty interest on hydrocarbons produced from the Marcellus Mineral Rights. J.A. 68. Article III adds that if there is a dispute regarding the occurrence of "Production Termination Events," it shall be settled in accordance with Section 5.9(b) of the Pine PSA. Id.

## B.

By written assignment in 2012, PetroEdge sold its interest in the Marcellus Mineral Rights to Statoil. That assignment agreement is subject to and incorporates the terms and conditions of a purchase and sale agreement--the Statoil PSA-- dated October 12, 2012, between Statoil and PetroEdge.

Section 10.1(a) of the Statoil PSA provides that Statoil shall assume responsibility for the "performance of all express

and implied obligations" arising from "instruments in the chain of title to the Assets, the Leases, the Contracts and all other orders, contracts and agreements to which the Assets are subject, including the payment of royalties and overriding royalties[.]" J.A. 450. The Statoil PSA lists the Pine PSA as a "Contract[] included in the Assets" that were sold by the Statoil PSA. J.A. 447, 453. The Statoil PSA further acknowledges that the obligation to drill "at least two (2)" wells (in addition to the Bumgardner 5-2H well) is an unfulfilled drilling obligation dictated by the Pine PSA. J.A. 449, 451.

By letter dated December 19, 2012--one day after the transaction contemplated by the Statoil PSA closed--PetroEdge notified Pine of its assignment to Statoil. The letter specifically noted that "Statoil is now the Purchaser under the [Pine] PSA." J.A. 459. The letter made no reference to the possibility that the duties of PetroEdge would not pass on to its assign Statoil.

After the assignment, Pine sought performance by Statoil on the Pine PSA. It is undisputed that Pine reached out multiple times to Statoil to schedule quarterly meetings with it, and that at least one such meeting took place. To date, however, no well drilling beyond the Bumgardner 5-2H has occurred on the Property.

C.

In 2014, Statoil sought a declaratory judgment confirming that--except for a duty to pay royalty interests upon production--its duties under the Pine PSA were expired, and it was thus not in breach of the Pine PSA and owed no duties to Pine beyond making royalty interest payments. Pine filed a breach of contract counterclaim, seeking damages for Statoil's alleged nonperformance under Section 5.7(b) of the Pine PSA. The parties filed cross-motions for summary judgment.

The district court granted summary judgment to Statoil, and denied Pine's motion for summary judgment on its counterclaim. Statoil USA Onshore Prop. Inc. v. Pine Res., LLC, No. 2:14-cv-021169, 2015 WL 5304295 (S.D. W.Va. Sept. 9, 2015). The court reasoned that because the introductory paragraph designated PetroEdge as the "Purchaser," and Section 5.7(b) only applied to the "Purchaser," Section 5.7(b) unambiguously applied to PetroEdge alone and not to its assign Statoil. Id. at *5. The court further held that by force of Section 7.2(a)'s residual clause, Section 5.7(b) terminated when PetroEdge, as "Purchaser," no longer held any interest in the Marcellus Mineral Rights. Id. The court rejected the notion that the successors and assigns provision in Section 8.8 modified the definition of the term "Purchaser" anywhere in the Pine PSA. Id. This appeal followed.

8

II.

We review a district court's disposition of cross-motions for summary judgment de novo. Libertarian Party of Va. v. Judd, 718 F.3d 308, 312 (4th Cir. 2013). "We view the facts and inferences arising therefrom in the light most favorable to the non-moving party to determine whether there exists any genuine dispute of material fact or whether the movant is entitled to judgment as a matter of law." Pender v. Bank of Am. Corp., 788 F.3d 354, 361 (4th Cir. 2015).

We also review de novo a district court's decision on an issue of contract interpretation. FindWhere Holdings, Inc. v. Sys. Env't Optimization, LLC, 626 F.3d 752, 755 (4th Cir. 2010). "The interpretation of a written contract is a question of law that turns upon a reading of the document itself, and a district court is in no better position than an appellate court to decide such an issue." Seabulk Offshore v. Am. Home Assurance, 377 F.3d 408, 418 (4th Cir. 2004).

III.

In our view, the district court read the successors and assigns provision in Section 8.8 too narrowly. That provision extends the contractual rights and duties of Pine and PetroEdge to their respective successors and assigns, in a contract whose provisions only speak about the rights and duties of the

"Seller," the "Purchaser," and the "Parties." Thus, if Section 8.8 is to have any meaning, it must have the effect of extending the application of the rights and duties provisions of the Pine PSA from beyond Pine and PetroEdge, and to the parties' respective successors and assigns in their stead (unless context dictates otherwise).

We read Section 8.8 to have such an effect, and therefore hold that the spudding obligations that Section 5.7(b) places on the "Purchaser" extend to PetroEdge's assign Statoil in PetroEdge's stead. However, the meaning of the term "Purchaser" in Section 7.2(a)'s residual clause is a more difficult question, because its context prevents us from concluding that the term unambiguously encompasses PetroEdge, and in its place its successors and assigns. We instead hold that Section 7.2(a)'s residual clause is ambiguous, but that extrinsic evidence clarifies that "Purchaser" in Section 7.2(a)'s residual clause is intended to encompass PetroEdge's assign Statoil. As such, the district court's conclusions that Section 5.7(b) is inapplicable to Statoil and also terminated by Section 7.2(a) are both erroneous.

A.

The Pine PSA provides--and no party disputes--that the agreement is to be construed in accordance with West Virginia

law.  Under West Virginia law, "the function of a court is to ascertain the intent of the parties as expressed in the language used by them" in their contract.  Zimmerer v. Romano, 679 S.E.2d 601, 610 (W. Va. 2009) (per curiam) (internal quotation marks omitted).  In performing this task, courts must read contracts "as a whole, taking and considering all the parts together[.]" Id. (internal quotation marks omitted).

Moreover, "specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract."  Dunbar Fraternal Order of Police, Lodge No. 119 v. City of Dunbar, 624 S.E.2d 586, 591 (W. Va. 2005) (per curiam) (internal quotation marks omitted).  Additionally, West Virginia courts "will not interpret a contract in a manner that creates an absurd result."  Id.

Generally, "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language . . . will be applied and enforced according to such intent." Arnold v. Palmer, 686 S.E.2d 725, 733 (W. Va. 2009) (internal quotation marks omitted).  "Extrinsic evidence will not be admitted to explain or alter the terms of a written contract which is clear and unambiguous."  Faith United Methodist Church & Cemetery of Terra Alta v. Morgan, 745 S.E.2d 461, 481 (W. Va. 2013) (internal quotation marks omitted).

By contrast, language is ambiguous when it is "reasonably susceptible of two different meanings," or is of "such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." Estate of Tawney v. Columbia Nat. Res., LLC, 633 S.E.2d 22, 28 (W. Va. 2006) (internal quotation marks omitted). "The question as to whether a contract is ambiguous is a question of law to be determined by the court." Fraternal Order of Police v. City of Fairmont, 468 S.E.2d 712, 717–18 (W. Va. 1996) (internal quotation marks omitted). Where contract language is ambiguous, extrinsic evidence may be consulted to aid in its construction. Yoho v. Borg-Warner Chems., 406 S.E.2d 696, 697 (W. Va. 1991) (per curiam).

B.

The introductory paragraph identifies PetroEdge as the "Purchaser" under the Pine PSA, and Section 5.7(b) of the Pine PSA imposes a spudding obligation on the "Purchaser." Based on these points, the district court concluded that the spudding obligation of Section 5.7(b) extends to PetroEdge alone, and not to its assign Statoil.

We disagree with this conclusion, in light of Section 8.8 of the Pine PSA, which contains the agreement's successors and assigns provision. Section 8.8 provides that the Pine PSA "shall be binding upon and inure to the benefit of the Parties

hereto and their respective successors and assigns." J.A. 63. We read Section 8.8 to extend the application of the rights and duties provisions of the Pine PSA--unless context dictates otherwise--from beyond Pine and PetroEdge, and to their respective successors and assigns in their stead.[3] Thus, reading the Pine PSA "as a whole," Zimmerer, 679 S.E.2d at 610, we hold that the spudding obligation of Section 5.7(b) extends to Statoil, in its capacity as PetroEdge's assign.

The district court rejected this reading of Section 8.8, concluding that "Section 8.8 does not modify the remainder of the contract; it simply provides that successors and assigns are to be bound by the contract terms." Statoil, 2015 WL 5304295, at *5. Those two conclusions, however, are inconsistent with one another. The Pine PSA is structured in terms of benefits for and burdens to the "Purchaser," the "Seller," and the "Parties;" thus, if those terms are not broadened to include those parties' successors and assigns, then it makes little sense to say that such a contract binds and benefits those

---

[3] In contrast, provisions of the Pine PSA that discuss the parties as parties, rather than as promisors and promisees under the agreement, are sensibly read to exclude the parties' successors and assigns. See J.A. 49 (the introductory paragraph); see also J.A. 51 (Section 3.1-describing the "Seller" as a West Virginia corporation) J.A. 54 (Section 4.1-describing the "Buyer" as a Delaware limited liability company); J.A. 62 (Section 8.2-listing the addresses of "Seller" Pine and "Purchaser" PetroEdge); J.A. 65-66 (signature page for the "Seller" and the "Purchaser").

parties' successors and assigns. See J.A. 57 (Section 5.7(b)-imposing a spudding obligation on the "Purchaser"); see also J.A. 56 (Section 5.4-allocating tax responsibilities between the "Seller" and the "Purchaser"); id. (Section 5.5-outlining quarterly meetings for the "Parties"). Indeed, by reading Section 8.8 to bind successors and assigns to a contract that does not speak to them, the district court in effect "treated [Section 8.8] as meaningless." Dunbar, 624 S.E.2d at 591. As such, the more natural reading of "Purchaser" in the rights and duties provisions of the Pine PSA--in light of Section 8.8--is a reading that generally encompasses PetroEdge, and in its place its successors and assigns.

Furthermore, the Deed granted by Pine to PetroEdge, which was attached to and expressly made part of the Pine PSA, makes sense only if the term "Purchaser" in the Pine PSA is generally not limited to PetroEdge alone. To elaborate, the Deed's Article III outlines an overriding royalty interest due to Pine --an interest that even Statoil concedes it will be responsible for paying Pine whenever mineral production takes place. See Appellee's Br. 17; see also J.A. 386 (establishing a royalty interest scheme "[n]otwithstanding anything to the contrary"). Article III, in turn, instructs that if a certain type of royalty dispute arises, that dispute will be "settled in accordance with Section 5.9(b) of the [Pine PSA]." J.A. 386.

Section 5.9(b), however, speaks in terms of "Seller" and "Purchaser"--meaning that if Section 5.9(b) is to be of any use in resolving a Statoil-Pine dispute, the term "Purchaser" therein will have to be read to include PetroEdge's assigns. This reading avoids the "absurd result" of a senseless Article III in the Deed. <u>Dunbar</u>, 624 S.E.2d at 591.

Moreover, a broad reading of the term "Purchaser" is consistent with the Pine PSA's apparent objective of promoting mineral production. In addition to spudding obligations, the Pine PSA's Article 5 sets forth meetings to discuss drilling plans, cooperation details in the event of parallel drilling or well maintenance operations, abandonment and restoration procedures in the event that a well ceases to produce, and a mineral royalty compensation structure. This elaborate production scheme would be frustrated if PetroEdge could simply assign its interest to a party that would in no way be subject to the scheme. Admittedly, a contract need not pursue its objectives at all costs, and so the Pine PSA's use of the term "Purchaser" could be conceived as a limitation on the agreement's effort to promote mineral production. Nonetheless, in light of Section 8.8's directive, we are satisfied reading the term "Purchaser" to be consistent with, rather than a limitation on, the Pine PSA's objectives.

Our approach is also consistent with relevant federal and state authorities within this Circuit. Those authorities confirm the general rule that a successors and assigns provision places a successor or assign in the shoes of its predecessor or assignor with respect to the rights and duties given to the latter under the relevant contract. See, e.g., Horvath v. Bank of N.Y., N.A., 641 F.3d 617 (4th Cir. 2011) (applying Virginia law); Cotiga Dev. Co. v. United Fuel Gas Co., 128 S.E.2d 626 (W. Va. 1962); see also Cook v. E. Gas & Fuel Assocs., 39 S.E.2d 321, 326-27 (W. Va. 1946) ("Ordinarily the assignee acquires no greater right than that possessed by his assignor, and he stands in his shoes.").

Cotiga, a decision from the Supreme Court of Appeals of West Virginia, is instructive. There, "Cotiga, as lessor, entered into an oil and gas lease with [Woods Oil], as lessee." Cotiga, 128 S.E.2d at 630. The court in Cotiga quoted three obligations that the lease agreement imposed on lessee Woods Oil, and all three did so using only the term "Lessee" (i.e., not "Lessee, its successors and assigns"). Id. at 630-31. The lease agreement, however, contained the following successors and assigns provision: "All the terms, grants, conditions and provisions of this lease shall extend to and be binding upon the successors and assigns of the parties hereto." Id. at 633 (emphasis added in Cotiga).

One day after the lease was signed, Woods Oil assigned the lease to United Fuel. Id. at 630. Relying on the successors and assigns provision, the court in Cotiga had no difficulty holding assign United Fuel responsible for the above-described obligations that the lease agreement by its literal terms imposed only on the "Lessee." "As a result of the lease assignment," the court observed, "United Fuel succeeded to only such rights as accrued to Woods Oil by the terms of the lease and thereby became burdened by all restrictions and obligations thereby imposed upon Woods Oil. . . . To all intents and purposes, United Fuel became the lessee in the place and stead of Woods Oil[.]" Id. at 633–34. In reaching this conclusion, the Supreme Court of Appeals of West Virginia adhered to a practical approach with respect to successors and assigns provisions, which we adhere to in this case as well.

Notably, this Court recently followed this practical approach in Horvath. In that case, a borrower argued that because a deed of trust defined the term "Lender" as company "AWL," a deed provision that vested foreclosure powers in the "Lender" empowered AWL alone to foreclose--and not any subsequent purchasers of the deed of trust. Horvath, 641 F.3d at 624–25. This Court rejected that narrow reading for several reasons: it would bring about the "absurd result" of a subsequent purchaser "paying for a worthless document" that the

purchaser would have "no power to administer or enforce;" it would contradict a provision stating that "[t]he covenants and agreements of this Security Instrument shall bind . . . and benefit the <u>successors and assigns</u> of Lender;" and it would go against "good sense," because "[i]f AWL were to sell its interest in the deed of trust, it would no longer be the 'Lender' in any meaningful sense." <u>Id.</u> at 625 (emphasis added in <u>Horvath</u>); <u>see also id.</u> (citing with approval the maxim that contracts must be construed "as a whole"). Instead, this Court broadly construed the term "'Lender' as applying not only to AWL but to any subsequent purchaser of the deed of trust." <u>Id.</u>

For similar reasons, a broad construction of the term "Purchaser"--one encompassing PetroEdge, and in its place its successors and assigns--is likewise appropriate for Section 5.7(b) of the Pine PSA. Such a construction complies with Section 8.8's successors and assigns provision, avoids the absurd result of a senseless Pine PSA and Deed, and respects the reality that PetroEdge is no longer the "Purchaser" in any meaningful sense for purposes of the Pine PSA or the achievement of the agreement's objectives. In reaching a contrary conclusion, the district court erred.

C.

Having decided that Section 5.7(b) applies to PetroEdge's assign Statoil, we must next decide whether that provision retains any force or effect. Section 7.2(a) contains two clauses that set deadlines for certain provisions of the Pine PSA, with the first one expressly excepting Sections 5.4 through 5.9 from its scope. Additionally, Section 7.2(a) contains a residual clause, which provides, "The remainder of [the Pine PSA] shall survive the Execution Date so long as Purchaser holds any interest in the [Marcellus] Mineral Rights." J.A. 61. We hold that the residual clause applies to Section 5.7(b). We also hold that the residual clause is ambiguous as to whether Section 5.7(b) survives so long as PetroEdge alone holds any interest in the Marcellus Mineral Rights, or so long as any such interest is held by PetroEdge, its successors or assigns. The subsequent conduct of Pine and PetroEdge nonetheless clarifies that the latter reading is the correct one.

1.

Before exploring the meaning of Section 7.2(a)'s residual clause, we must address whether that clause even governs Section 5.7(b). Section 5.7(b) is not governed by Section 7.2(a)'s second clause, and it is specifically excepted from the scope of Section 7.2(a)'s first clause. Because Section 5.7(b) is not

governed by either clause, it is sensible to place it within the scope of Section 7.2(a)'s residual clause (which governs the "remainder" of the Pine PSA).

Pine resists this conclusion. According to Pine, because Section 7.2(a)'s residual clause is a general catch-all, it cannot govern Section 5.7(b), which is specifically excepted from the scope of Section 7.2(a)'s first clause. Pine supports this argument with a reference to the interpretive principle that general language must usually yield to more specific language when the two conflict.

Unfortunately for Pine, its reliance on this principle is misplaced. In this case, there is no conflict between the specific exception in Section 7.2(a)'s first clause and the general language in Section 7.2(a)'s residual clause. Rather, the latter clause simply picks up, inter alia, the provisions specifically dropped out of the former clause.[4] Thus, we have no difficulty reading Section 7.2(a)'s residual clause to govern Section 5.7(b).

---

[4] <u>Cf.</u> <u>Shannondale, Inc. v. Jefferson Cty. Planning & Zoning Comm'n</u>, 485 S.E.2d 438, 498 (W. Va. 1997) (per curiam) (rejecting the argument that a general ordinance provision was superseded by a specific ordinance provision, because the two could be reconciled).

Having arrived at this determination, we now turn to the issue of how Section 7.2(a)'s residual clause impacts Section 5.7(b) following PetroEdge's assignment to Statoil. If the residual clause carries a terminating effect when PetroEdge, as "Purchaser," ceases to have any interest in the Marcellus Mineral Rights, then PetroEdge's assignment would give rise to a termination of Section 5.7(b); if the residual clause carries a preservation effect so long as PetroEdge, or its successors and assigns, has interest in the Marcellus Mineral Rights, then Section 5.7(b) is preserved even after PetroEdge's assignment. We acknowledge that there are persuasive arguments on both sides of this issue.

According to Statoil, when the residual clause instructs that it preserves the provisions within its scope "so long as Purchaser holds any interest in the [Marcellus] Mineral Rights," J.A. 61, the clause sets as a deadline the date that PetroEdge ceases to hold any mineral interests. For support, Statoil references the introductory paragraph's identification of PetroEdge as the Pine PSA "Purchaser."

Statoil rejects the notion that the term "Purchaser" in Section 7.2(a)'s residual clause can include PetroEdge's successors and assigns, because under such a reading the deadline that the residual clause purports to set becomes

illusory. They argue that if "Purchaser" in Section 7.2(a) includes successors and assigns, then none of the provisions to which the residual clause is applicable will ever expire and will last into perpetuity.

Meanwhile, there are also arguments favoring a broader reading of the residual clause--one that preserves the provisions within its scope so long as PetroEdge, or in its place its successors or assigns, holds any interest in the Marcellus Mineral Rights. Although the residual clause refers only to "Purchaser," to the extent that the residual clause shapes the rights and duties of the parties, Section 8.8 seems to broaden "Purchaser" to include PetroEdge's successors and assigns.

This broad construction may impair the residual clause's utility as a deadline clause, but, one may argue, there is no need for the residual clause to serve such a function. Whereas Section 7.2(a)'s first two clauses set specific deadlines for the provisions they govern, its residual clause could be read as a clause intended to attach a longer effect to the provisions it governs. Although this reading would allow PetroEdge's successor or assign to participate in the Pine PSA's mineral production scheme in PetroEdge's place, there is no indication in the Pine PSA that PetroEdge was irreplaceable in this scheme.

In our view, both sides present reasonable constructions of Section 7.2(a)'s residual clause. "The meaning of a word is to be considered in the context in which it is employed." <u>Legg v. Johnson, Simmerman & Broughton, L.C.</u>, 576 S.E.2d 532, 537 (W. Va. 2002) (per curiam) (internal quotation marks omitted); <u>see also</u> <u>Torres v. Lynch</u>, 136 S. Ct. 1619, 1625 (2016) (explaining that "many words" can "take[] on different meanings in different contexts"). Although the term "Purchaser"--in conjunction with Section 8.8--unambiguously encompasses PetroEdge's successors and assigns in the context of <u>rights and duties provisions</u>, it is difficult to conclude that such a broad construction is unambiguously proper in the context of a residual clause of a <u>limitations provision</u>. On the other hand, in light of the traditional rule that an assign stands in the shoes of the assignor, the residual clause is inadequate to indicate a clear intent by the parties to in large part depart from this rule.[5] Because the term "Purchaser" is "reasonably susceptible of two different meanings," we hold that the term is ambiguous in Section 7.2(a). <u>Tawney</u>, 633 S.E.2d at 28.

---

[5] <u>Cf.</u> <u>Tawney</u>, 633 S.E.2d at 28 (finding an ambiguity where, "in light of [West Virginia's] traditional rule that lessors are to receive a royalty of the sale price of gas, the general language at issue simply [was] inadequate to indicate an intent by the parties to agree to a contrary rule").

Having identified an ambiguity in Section 7.2(a)'s residual clause, we now resort to extrinsic evidence for clarification. Yoho, 406 S.E.2d at 697. In this case, we are guided by the "practical construction given to the contract by the parties themselves . . . subsequent[]" to its execution. Kelley, Gidley, Blair & Wolfe, Inc. v. City of Parkersburg, 438 S.E.2d 586, 589 (W. Va. 1993) (per curiam) (internal quotation marks omitted). As "Lord Sugden once said: 'Tell me what the parties have done under a contract and I will tell you what the contract means.'" Watson v. Buckhannon River Coal Co., 120 S.E. 390, 394 (W. Va. 1923).

PetroEdge's conduct shows that it read the Pine PSA as carrying no provision that terminates Section 5.7(b) upon assignment. In its post-assignment letter to Pine, PetroEdge noted that Statoil was now the "Purchaser" under the Pine PSA, but made no suggestion that Section 7.2(a)'s residual clause freed Statoil of any of PetroEdge's duties under the agreement. On the contrary, in the Statoil PSA, PetroEdge expressly communicated to Statoil that the latter was acquiring PetroEdge's duties. The Statoil PSA expressly noted that Statoil was taking the assigned assets subject to the obligations arising from the Pine PSA, and it specifically cited

the "unfulfilled drilling obligations," J.A. 449, of "two (2) additional wells," J.A. 451, as arising from the Pine PSA.[6]

Pine's conduct is likewise consistent with a broad reading of Section 7.2(a)'s residual clause. Following PetroEdge's assignment, Pine sought Statoil's performance under the Pine PSA (and under Section 5.7(b) in particular) through multiple reach-out efforts and litigation with Statoil. This conduct comports with the notion that Section 7.2(a) did not, post-assignment, terminate Section 5.7(b).

In light of this conduct by Pine and PetroEdge, we conclude that Section 7.2(a)'s residual clause was intended to preserve the provisions within its scope so long as PetroEdge--or its successors or assigns--possessed any interest in the Marcellus Mineral Rights. Because Statoil, in its capacity as PetroEdge's assign, possesses such interest, we hold that the spudding obligations of Section 5.7(b) retain force and continue to

---

[6] Statoil insists that, through this language, PetroEdge was simply citing its own drilling obligations under the Pine PSA. We disagree. If PetroEdge truly believed that its drilling obligations were not being passed down to Statoil, then presumably PetroEdge would have either omitted reference to those obligations altogether, or would have at least appended to its citation of those obligations in the Statoil PSA the crucial detail that those obligations were not being passed down to Statoil. PetroEdge did not do so, and so we reject Statoil's creative reasoning.

govern Statoil. Again, we reject the district court's contrary conclusions.[7]

## IV.

Statoil presents an alternative ground for affirming the district court's decision to rule against Pine on its breach of contract counterclaim. Statoil asserts that even if it was obligated to spud, its failure to do so caused Pine no injury, because spudding is only a preliminary development procedure that would not necessarily lead to the production of hydrocarbons and resulting royalty payments. Pine, meanwhile, contends that Statoil understates both the requirements of the spudding obligation, and the extent to which non-compliance with those requirements impaired Pine's prospects of ultimately receiving royalty payments.

---

[7] Although we rule in favor of Pine, we do so without reliance on the contra proferentem rule that Pine urges upon us. That rule dictates that residual ambiguity be construed against drafter PetroEdge and in Pine's favor, Evans v. Bayles, 787 S.E.2d 540, 541 n.1 (W. Va. 2016); however, in this case PetroEdge and Pine do not disagree on the definition of "Purchaser." We acknowledge Pine's citation to cases suggesting that contra proferentem applies even to assigns, see Appellant's Br. at 56-57, but note that those cases do not deal with a scenario where the assign's construction conflicts with the construction shared by both the drafter-assignor and the non-drafting party. This case presents such a scenario, and so in light of our ability to resolve this case otherwise, we do not rely on contra proferentem.

We acknowledge our discretion to affirm on any ground supported by the record, even if it was never relied upon by the district court.  See Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014).  Nonetheless, we decline to engage in a complex injury analysis here based on short passages from the parties' briefs.  Instead, we leave the issue of injury for the district court to address on remand in the first instance.  See Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); Goldfarb v. Mayor & City Council of Baltimore, 791 F.3d 500, 515 (4th Cir. 2015) ("The district court is in a better position to consider the parties' arguments in the first instance, which can be presented at length rather than being discussed in appellate briefs centered on the issues the district court did decide.").

V.

For the foregoing reasons, we vacate the judgment of the district court.  We remand this case with instructions to the district court to grant summary judgment in favor of Pine on Statoil's declaratory judgment claims, and to consider in the first instance Statoil's injury argument in connection with Pine's breach of contract counterclaim.

VACATED AND REMANDED