# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

STATOIL USA ONSHORE
PROPERTIES INC.,

         Plaintiff,

v.              CIVIL ACTION NO. 2:14-cv-021169

PINE RESOURES, LLC,

         Defendant.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed *Statoil USA Onshore Properties Inc.'s Motion for Summary Judgment* (Document 103) and *Memorandum of Law in Support* (Document 104), *Defendant Pine Resources, LLC's Response in Opposition to Plaintiff's Motion for Summary Judgment* (Document 105), and *Statoil USA Onshore Properties Inc.'s Reply in Support of Its Motion for Summary Judgment on Damages* (Document 110). The Court has also reviewed *Defendant Pine Resources, LLC's Motion for Summary Judgment on Damages* (Document 107) and *Memorandum of Law in Support* (Document 108), *Statoil USA Onshore Properties Inc.'s Response in Opposition to Pine Resources, LLC's Motion for Summary Judgment on Damages* (Document 112), and *Defendant Pine Resources, LLC's Reply in Support of Its Motion for Summary Judgment on Damages* (Document 113). Additionally, the Court has reviewed all attached exhibits. For the reasons stated herein, the Court finds that both motions for summary judgment should be denied.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This case involves a contract dispute between the Plaintiff, Statoil, and the Defendant, Pine. The Court previously issued an opinion granting summary judgment to Statoil on the issue of whether it was bound by certain contract provisions as the successor to the party that entered into the contract. (Mem. Op. and Order) (Document 90). The Fourth Circuit reversed and remanded. (4CCA Op.) (Document 97). The factual background is thoroughly set forth in those opinions, which the Court incorporates herein. Therefore, only a brief summary of the relevant facts is necessary.

Pine owned the mineral interests for a 565-acre tract of land in Barbour County, West Virginia (the Langley tract). In 2008, Pine sold the Marcellus mineral rights to PetroEdge, a non-party to this suit, for $479,876.00, pursuant to the terms of a Purchase and Sale Agreement (PetroEdge PSA). (att'd as Pl.'s Ex. 1) (Document 103-1.) Pine retained an 18% overriding royalty interest (ORRI). The PetroEdge PSA provided, among other things, that the Purchaser would apply for a meter tap on a gas transmission line within sixty days of execution of the PetroEdge PSA, spud[1] one well within one year after installation of the meter tap, and spud three wells (including the first well) within five years after installation of the meter tap. (*Id.* at § 5.7.) The specific language, as relevant, is as follows:

> (a) On or before the sixty (60) day anniversary of the Execution Date, Purchaser shall apply for a meter tap on a gas transmission line of Purchaser's choice in Barbour County, West Virginia at a location to be specified by Purchaser. The day upon which such

---

[1] The parties dispute the implications of the contract language requiring that the Purchaser 'spud' wells. Merriam-Webster defines "spud" as "to begin to drill (an oil well)." *Spud*, Merriam-Webster's Collegiate Dictionary (10th ed. 1998); *see also Merriam-Webster.com*. Merriam-Webster, n.d. Web. (visited June 14, 2017). Likewise, representatives of Pine and experts for both parties stated that "spudding" a well refers to the start of the drilling process.

> meter tap is installed shall be referred to herein as the "Langley Tap Installation Date."
> (b)    On or before the one (1) year anniversary of the Langley Tap Installation Date, Purchaser shall spud not less than one (1) well on the Contract Area.   On or before the five (5) year anniversary of the Langley Tap Installation Date, Purchaser shall spud not less than three (3) wells on the Contract Area (provided that, for the avoidance [of] doubt, any well spudded in satisfaction of the obligation described in the preceding sentence shall also be credited towards the obligation described in this sentence).

(PetroEdge PSA § 5.7.)

PetroEdge twice negotiated for additional time to apply for the meter tap and to begin the first well.   It began drilling one well, the Bumgardner 5-2H, but did not complete the well or begin production.   The surface entry point of drilling for the Bumgardner 5-2H is not within the Contract Area, and PetroEdge did not consider it to satisfy the PetroEdge PSA until the lateral drilling reached the Contract Area.   There is dispute as to whether the Bumgardner 5-2H satisfies one of the well requirements in the PetroEdge PSA in its current, non-producing state.   In 2012, PetroEdge sold the Marcellus mineral rights to Statoil via the Statoil PSA.   (att'd as Def.'s Ex. 6) (Document 105-1.)   The Statoil PSA specifically references the unfulfilled obligation to drill two additional wells on the Langley tract.   Pine representatives testified that Pine insisted on a drilling obligation in the PetroEdge PSA because the Langley tract was the most valuable to Pine, based on its size and Pine's ownership of all mineral rights for the tract.   Those representatives recalled some negotiation regarding the timing of the obligation to spud wells.   They testified that the intent of the PetroEdge PSA as a whole, and Section 5.7 specifically, was to ensure prompt completion of wells and production of gas.

The PetroEdge PSA contains a provision disclaiming any "special, punitive, indirect or consequential damages in connection with this Agreement and the transactions contemplated

thereby." (PetroEdge PSA at § 8.13.) Both parties have submitted expert reports[2] regarding the potential damages arising from the lack of royalty payments due to the failure to complete wells, with vastly divergent results, based on different methodologies and different assumptions as to anticipated output and anticipated prices.

Statoil previously sought summary judgment on two grounds: that it was not bound by the contract provisions at issue, and that the asserted breach did not result in damages. The Court found that it was not bound by the contract provisions and did not reach the damages question. The Fourth Circuit reversed, finding that the contract should be read more broadly to give meaning to a successors and assigns clause and to be "consistent with the Pine PSA's apparent objective of promoting mineral production." (4CCA Op. at 15.) However, the Fourth Circuit "decline[d] to engage in a complex injury analysis" and instead left "the issue of injury for the district court to address on remand in the first instance." (*Id.* at 27.) Pine and Statoil have filed cross motions for summary judgment, which are fully briefed and ripe for ruling.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could

---

[2] Both parties have filed motions seeking to exclude the opposing party's experts. For purposes of the motions for summary judgment, the expert reports will be considered to the extent they provide relevant information within the applicable standard of review.

affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*,

5

477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review. *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd*, 474 F. App'x 101 (4th Cir. 2012). Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## DISCUSSION

Statoil moves for summary judgment "because Pine has suffered no cognizable injury and had no recoverable damages." (Statoil Mem. in Supp. of MSJ, at 2.) Statoil argues that the contract does not require that wells be completed or producing, and failure to spud wells does not itself result in lost royalties. Further, Statoil contends, any damages related to the failure to spud wells would be consequential damages, which are waived in the PetroEdge PSA. Should its motion for summary judgment be denied, Statoil argues that factual disputes preclude summary judgment for Pine. Statoil emphasizes disputes related to the proper contract interpretation based on the parties' conduct, and the assumptions necessary to generate a damages estimate, including the type of wells, the amount of anticipated mineral production, and future price estimates.

Pine argues that Statoil's interpretation of Section 5.7 generates an absurd result that would render the contract senseless. Pine urges the Court to interpret the spudding obligation in the context of the PSA and in light of the parties' intent, and find that Statoil was required to drill completed wells and bring them on line. Pine suggests that, because the PSA and deed transferred Marcellus mineral rights, "spudding" means to begin to drill at the Marcellus layer. Pine further argues that "when a party refuses to perform the underlying work to generate oil and gas production, as required by the contract, the lost production constitutes direct damages flowing from the breach." (Pine Resp. to Statoil MSJ, at 5.) Pine states that damages are reasonably ascertainable based on its expert's analysis, and seeks judgment in the amount of at least $1,846,040, plus pre- and post-judgment interest.

Courts considering contract cases must first determine as a matter of law whether the contract is ambiguous. *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court.") A writing is ambiguous if it is "reasonably susceptible of two different meanings" particularly "in light of the surrounding circumstances." *Estate of Tawney v. Columbia Natural Res., LLC*, 633 S.E.2d 22, 28 (W. Va. 2006). However, "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous." *Berkeley County Public Service Dist. v. Vitro Corp. of America*, 162 S.E.2d 189, 200 (W. Va. 1968). When the intent of the parties is set forth in unambiguous language, the contract must be enforced according to its plain meaning. *Zimmerer v. Romano*, 679 S.E.2d 601, 610 (W. Va. 2009) (citing Syl. pt. 1, *Cotiga Development Company v. United Fuel Gas Company,* 128 S.E.2d 626 ( W. Va. 1963)). If the contract language is ambiguous, courts may consider extrinsic evidence to determine the intent of the parties. *Estate*

*of Tawney*, 633 S.E.2d at 30, footnote 5 (quoting from *Watson v. Buckhannon River Coal Co.*, 95 W. Va. 164, 120 S.E. 390 (1923)). If extrinsic evidence is in conflict or subject to alternative interpretations, the meaning must be determined by a fact-finder. *Id.* However, courts may interpret ambiguous contracts when rules of construction govern the outcome or when there is no factual conflict regarding the extrinsic evidence.

In West Virginia, compensatory damages in a breach of contract case "are those as may fairly and reasonably be considered as arising naturally—that is, according to the usual course of things—from the breach of the contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of its breach." Syl. Pt. 2, *Kentucky Fried Chicken of Morgantown, Inc. v. Sellaro*, 214 S.E.2d 823, 824 (W. Va. 1975). "Compensatory damages…must be proved with reasonable certainty." *Id.* at Syl. Pt. 3. Direct damages are "those directly flowing from the contract breach" and "are a natural consequence of the breach." Syl. Pt. 2, *Desco Corp. v. Harry W. Trushel Const. Co.*, 413 S.E.2d 85, 87 (W. Va. 1991). Consequential damages are those "that arise from the special circumstances of the contract," and require a showing that "at the time of the contract the parties could reasonably have anticipated that these damages would be a probable result of a breach." *Id.* "Whether contract damages are direct or consequential is a question of law for the trial court." *Id.* at Syl. Pt. 3.

The Court's interpretation of the PetroEdge PSA must be guided by the Fourth Circuit's conclusions in this case. The Fourth Circuit found, based on the spudding obligations, the requirement that the purchaser hold regular meetings, the provisions for cooperation during drilling and well maintenance, the procedures set forth for abandonment and restoration of a well that

ceased to produce, and the mineral royalty compensation structure, that the PSA had the "apparent objective of promoting mineral production." (4CCA Op. at 15.) In concluding that Statoil was bound by the contract provisions at issue, the Fourth Circuit noted that "[t]his elaborate production scheme would be frustrated if PetroEdge could simply assign its interest to a party that would in no way be subject to the scheme." (*Id*.) The Fourth Circuit further utilized a broad construction of the contractual terms.

In light of the Fourth Circuit's construction and findings and the context of the PetroEdge PSA as a whole, the Court finds the PSA is ambiguous with respect to whether mineral production is required. As an initial matter, it is clear that Statoil is in breach of Section 5.7(b), as it has not either begun or completed two of the three required wells. The parties dispute whether Section 5.7 should be read to require production and accompanying royalty payments. The plain language of Section 5.7(b) requires only that the "Purchaser shall spud not less than three (3) wells on the Contract Area" within five years after the installation of a meter tap. (PetroEdge PSA, § 5.7(b).) The dictionary, the parties, and the experts all agree that a well is "spud" when drilling begins, despite Pine's arguments to the contrary in its briefing. The contract does not contain an express production requirement or a royalty acceleration clause, and the absence of such a provision must be considered in determining the parties' intent.[3] However, the Fourth Circuit has found that the contract as a whole has the objective of promoting mineral development. Although Section 5.7 sets forth deadlines for beginning the wells, it could be read to impliedly require that those wells

---

3 This Court recently found a royalty acceleration clause enforceable in Lampert v. Tams Management, 5:15-cv-6746. There, a landowner transferred his interest in a coal mine to Tams Management. The parties signed a contract setting a timeline for Tams to pursue permits, and a royalty acceleration clause requiring Tams to pay the first $2,000,000 in royalties if it failed to obtain the permits within the deadline set forth in the contract. *Memorandum Opinion and Order*, 5:15-cv-6746, (March 11, 2016).

be completed within a reasonable time, and that section, together with the remainder of the contract, could be read to require production. As Statoil's position in this case demonstrates, there is little point in beginning to drill a well without completing it.[4]

Pine's representatives testified that it was their understanding that the intent of the contract was to require production. Statoil has presented evidence that PetroEdge considered the drilling obligation satisfied with respect to the Bumgardner 5-2H well, which remains incomplete and is not producing. The extrinsic evidence presented, therefore, does not clearly resolve whether the PetroEdge PSA requires production of minerals. The remainder of the PSA does not provide clarity. Although the PSA clearly *contemplates* production, it does not clearly *require* production. It sets forth the royalties that must be paid on any gas produced, as is typical in contracts conveying mineral rights, but does not expressly require the Purchaser to produce gas. Because the contract does not contain an express production requirement, it is not clear that Pine has been injured by Statoil's breach of the spudding obligation. Thus, the Court need not reach Pine's arguments regarding the proper calculation of damages, except to note that there remains significant factual dispute to be considered at trial, should the case reach that point. Neither party has met its burden of demonstrating that it is entitled to judgment as a matter of law. In short, Statoil has not shown that it would be entitled to judgment as a matter of law if factual disputes and inferences were resolved in favor of Pine. Likewise, Pine has not shown that it would be entitled to judgment as a matter of law if factual disputes and inferences were resolved in favor of Statoil. Therefore,

---

4 However, there may be scenarios in which a company would choose to delay producing minerals in hopes of improved market conditions, even with a completed well. Because the PetroEdge PSA is silent as to any production requirement, it is not clear whether there are circumstances in which Statoil or its successor(s) could choose to place a viable well off-line, if the PSA is read to require completed wells.

summary judgment is not appropriate.

## CONCLUSION

WHEREFORE, after thorough review and careful consideration, the Court hereby **ORDERS** that *Statoil USA Onshore Properties Inc.'s Motion for Summary Judgment* (Document 103) be **DENIED**, and that *Defendant Pine Resources, LLC's Motion for Summary Judgment on Damages* (Document 107) be **DENIED**.

The Court observes that the parties conducted mediation prior to the issuance of this opinion. Accordingly, the Court **ORDERS** that this matter be **REFERRED** to the Honorable Omar J. Aboulhosn, United States Magistrate Judge, for mediation.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to Magistrate Judge Aboulhosn, to counsel of record, and to any unrepresented party.

ENTER: June 16, 2017

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA