# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

STATOIL USA ONSHORE
PROPERTIES INC.,

                  Plaintiff,

v.                                               CIVIL ACTION NO. 2:14-cv-21169

PINE RESOURES, LLC,

                  Defendant.

### MEMORANDUM OPINION AND ORDER

On July 17 and July 18, 2017, the parties appeared before the Court for a bench trial in the above-styled matter. The Court has reviewed *Statoil USA Onshore Properties Inc.'s Post-Trial Proposed Findings of Fact and Conclusions of Law* (Document 154) and *Defendant Pine Resources, LLC's Proposed Post-Trial Findings of Fact and Conclusions of Law* (Document 155), as well as all testimony and exhibits introduced during trial. For the reasons stated herein, the Court concludes that Statoil USA Onshore Properties Inc. (Statoil) is entitled to judgment in its favor.

### FINDINGS OF FACT

This case has a somewhat protracted procedural history, and several pertinent issues were resolved by the Fourth Circuit or by this Court during consideration of motions for summary judgment. Therefore, the Court will provide a brief procedural history and an overview of the key contractual provisions at issue prior to making findings of fact based on the testimony and evidence presented during the bench trial.

### A. *Procedural History*

This litigation began on July 8, 2014, with a complaint seeking declaratory judgment in favor of Statoil.[1] Pine Resources, Inc. filed a counterclaim on August 22, 2014. In brief summary, Pine entered into a Purchase and Sale Agreement (Pine PSA), conveying the Marcellus mineral rights on a 565-acre tract of land, the Langely tract, to PetroEdge, a non-party, in 2008. In 2012, PetroEdge conveyed its interest to Statoil. The contract contained a provision, described more fully below, requiring the Purchaser to spud one well within one year and an additional two wells within five years. Statoil sought declaratory judgment that those provisions did not apply to it under the terms of the Pine PSA. On September 9, 2015, the Court issued an opinion granting summary judgment to Statoil, finding that certain provisions of the contract were applicable only to PetroEdge, and not to its successors or assigns. The Fourth Circuit reversed and remanded, holding that Statoil stepped into PetroEdge's shoes for purposes of the Pine PSA. Thus, it has been established that Statoil breached the Pine PSA by failing to spud the required wells.[2]

The parties had also provided briefing regarding damages: Pine argued that Statoil was required to complete wells and produce minerals, and Pine should therefore receive damages based on its lost royalties. Statoil argued that no damages resulted from any breach of the spudding requirement, because minerals are produced when a well is completed, not when it is spud, and the contract does not expressly require production. The Fourth Circuit declined to address the damages question. It did, however, find that the Pine PSA had an "apparent objective of

---

1 The matter was initially assigned to Judge Joseph Robert Goodwin, and was re-assigned to the undersigned on May 5, 2015.
2 It remains in dispute whether the obligation is satisfied as to the first well, which PetroEdge began drilling but did not complete. It is undisputed that Statoil did not begin the other two wells.

promoting mineral production," which it described as an "elaborate production scheme."[3] (4CCA Op. at 15) (Document 97). The parties filed cross-motions for summary judgment on damages. Statoil argued that Pine could not establish damages resulting from its breach of the Pine PSA. Pine argued that "spudding" could be interpreted to require drilling, completing, and producing mineral from a well, while Statoil argued that "spudding" a well means only beginning a well. The Court held that "spudding," which is not defined in the Pine PSA, means to begin to drill a well, as defined by dictionaries, court decisions, and the experts in this matter. However, the Court found that the contract as a whole could be read to require production, and denied summary judgment. Thus, the issues that remained for resolution at trial were (a) whether the Pine PSA, together with extrinsic evidence, required production, and if so, (b) the amount of damages resulting from Statoil's failure to drill the wells and produce minerals.

B. *Contract Language*

The Pine PSA provided for the sale of the Marcellus mineral rights to PetroEdge for a purchase price of $479,876. (Pine PSA at § 2.1) (Tr. Ex. 3, Document 145-4.) Section 5.5, entitled "Consultation Regarding Operations," provides:

> From and after the execution Date and until such time as Purchaser no longer has an interest in the Mineral Rights, the Parties agree to meet on a Calendar Quarter basis to consult with each other regarding each Party's drilling plans and surface operations within the Contract Area (the "Quarterly Meetings"). No later than thirty (30) days prior to each scheduled Quarterly Meeting, each Party will

---

[3] The Court recognizes that it is bound by the Fourth Circuit's interpretation of the contract and has viewed the evidence in light of that interpretation. However, this Court would not have reached the same conclusions. The spudding obligation does appear to be designed to promote production. The remaining contract terms cited by the Fourth Circuit, such as royalty structures, cooperation details in the event of parallel drilling operations, and well abandonment procedures, would be natural terms to include in any mineral lease or sale that *contemplates*, but does not *require*, drilling or production. Further, Pine received a payment of $479,876.00 for the Marcellus mineral rights to the Langley tract, only about $20,000 less than the entire purchase price Pine paid for the property less than a decade before. This Court would not have concluded that production of minerals, rather than the sale of certain mineral rights in return for substantial consideration, was central to the purpose of the Pine PSA.

provide to the other Party its anticipated drilling plans for the following Calendar Quarter. Each Party shall use its reasonable efforts to cooperate with the other in its respective operations.

Section 5.6, entitled "Joint Use of Contract Area," provides:

> (a) The Parties understand that each Party may have existing or future wells, pipelines, and access roads located within the Contract Area, and no Party shall unreasonably interfere with or impede the operations of the other Party within the Contract Area. Upon request by a Party, the other Party shall permit such requesting Party the right to utilize any existing well pads and access roads in the Contract Area in a manner that does not unreasonably interfere with the operations of such other Party. The requesting Party shall make repairs for any damage to and to share in the cost of maintenance of any shared well pads or access roads for so long as the requesting Party continues to share such wellpads and access roads with the non-requesting Party, and indemnify the non-requesting Party for any other Damages sustained by the non-requesting Party as a result of the requesting Party's use of such shared wellpads and access roads.
> (b) Whenever the Parties are drilling, operating or maintaining wells on the Contract Area at the same time, then the Parties shall cooperate with each other in a reasonably commercial manner so that such parallel activities can be accommodated.

Section 5.7 has been and remains central to the parties' dispute in this case. That section, entitled "Certain Obligations of Purchaser," provides as follows:

> (a) On or before the sixty (60) day anniversary of the Execution Date, Purchaser shall apply for a meter tap on a gas transmission line of Purchaser's choice in Barbour County, West Virginia at a location to be specified by Purchaser. The day upon which such meter tap is installed shall be referred to herein as the "Langley Tap Installation Date."
> (b) On or before the one (1) year anniversary of the Langley Tap Installation Date, Purchaser shall spud not less than one (1) well on the Contract Area. On or before the five (5) year anniversary of the Langley Tap Installation Date, Purchaser shall spud not less than three (3) wells on the Contract Area (provided that, for the avoidance [of] doubt, any well spudded in satisfaction of the obligation described in the preceding sentence shall also be credited

4

> towards the obligation described in this sentence). Any horizontal well drilled by or on behalf of Purchaser for which the surface location is not in the Contract Area but (i) for which any portion of the lateral thereof traverses any part of the Contract Area, or (ii) whose pool or unit includes any portion of the Contract Area, shall be credited towards satisfaction of Purchaser's obligations under this Section 5.7(b).

(Pine PSA § 5.7.)

Section 5.8 is entitled "Abandonment and Restoration," and establishes a procedure by which a party abandoning a well that is not producing sufficient hydrocarbons must provide notice to the other party and permit the other party to take over operation of the well. Should the non-abandoning party take over the well, that party also accepts responsibility for plugging and restoring the well and the site. Section 5.9 contains Pine's 18% overriding royalty interest (ORRI) in any hydrocarbons produced from acreage within the Langley tract. That section further provides that the ORRI expires when 90% of the reserves associated with a well have been produced or when only 5% of the value of the well remains. If the parties dispute whether those benchmarks have been reached, Section 5.9(b) details an arbitration procedure.

### C. Fact Findings from Trial

Pine Resources has two principals who jointly own the company: Richard Heffelfinger and Richard Rubin. Mr. Heffelfinger and Mr. Rubin have been in business together since around 2000, and both have decades of experience in the oil and gas industry. They formed Pine Resources in order to purchase the Langley property, initially with the intention of timbering it. The Langley property consists of 565 acres, and Pine purchased both surface and mineral rights for $500,000. Pine entered into a five-year lease of the coalbed methane rights on the property, but the lessee did not develop the property. When the Marcellus shale boom began in West

5

Virginia, PetroEdge expressed interest in the Langley tract. Pine wanted to sell, rather than lease, the Marcellus mineral rights, in order to receive more beneficial tax treatment. Pine and PetroEdge, each with the assistance of counsel, negotiated the Pine PSA, setting forth the terms for the sale of the Marcellus mineral rights and the ongoing relationship between PetroEdge as Purchaser and Pine as the seller and surface owner. PetroEdge drafted the agreement. The price of $479,876 was a per-acre price, and Mr. Heffelfinger testified that PetroEdge, at the insistence of its financers, reduced the price shortly before the contract was finalized due to a reduction in gas prices. Gas prices were at their height when PetroEdge approached Pine in 2008, and remain substantially below that peak.

Mr. Heffelfinger testified that he and Mr. Rubin "were very clear that the Langley was the largest, most valuable property that we had and required completion and — development and completion and production." (Tr. at 59:5-9.) The contract terms were negotiated over time, with new provisions added to suit the needs and interests of each party. For tax reasons, Pine wanted the 18% ORRI to terminate when 90% of the reserves were depleted, and the Pine PSA includes a process for arbitration if the parties disagree as to when that threshold has been reached. Likewise, the Pine PSA contains specific terms detailing the parties' respective obligations should the Purchaser choose to abandon a well after concluding that it was not producing in economic quantities. Pine requested the inclusion of the spudding timeline contained in Section 5.7(b), and PetroEdge negotiated for the timeline to begin with the Langley tap installation date to avoid any inability to meet the deadline if the pipelines did not provide access promptly.

PetroEdge began the process of getting the meter tap installed, but delayed installation when it chose to delay drilling. Mr. Heffelfinger spoke with Larry Richard of PetroEdge, taking

6

the position that PetroEdge could not delay the spudding timeline by delaying the tap installation, because that provision was included only to account for delays on the part of the pipeline company. PetroEdge and Pine entered into a written agreement to extend the time for spudding the first well in exchange for $100,000. (Tr. Ex. 10.) They also agreed that the Langley tap date would be April 1, 2009, resulting in a deadline of April 1, 2014, for spudding the second and third wells. (*Id.*) PetroEdge began drilling the Bumgardner 5-2H well. Because the top hole of the well was not on the Langley tract, the well was "spud" for purposes of the Pine PSA only when the horizontal drilling reached the Langley tract. PetroEdge and Pine agreed to extend the spudding deadline for the first well until March 31, 2012, because PetroEdge had difficulty obtaining a horizontal drilling rig for the property within the deadline. Pine agreed to that extension without additional consideration.

On cross-examination, Mr. Heffelfinger conceded that the Pine PSA does not expressly require production. He agreed that it is "possible" that the Purchaser "could choose to defer the production of gas until, for example, the price of gas rebounded," or until the Purchaser determined it would be economic to produce. (Tr. at 175:23-25.) He insisted that the PSA nonetheless required production because "it's a pointless agreement if it doesn't say complete. No oil and gas agreement, no lease says you have to complete a well. But it's a pointless agreement in here if the obligation is not to complete and produce these wells." (Tr. at 146:18-22.) On direct, Mr. Heffelfinger testified that he believed that the spudding obligation in the Pine PSA required drilled, completed, and producing wells. He also testified that he clarified his position about the intent of the Pine PSA while discussing the extension of the spudding deadline with Larry Richard of PetroEdge, and Mr. Richard agreed. However, the Court did not find Mr. Heffelfinger's

7

testimony credible in that regard based on his tone and demeanor during testimony and the context of the conversation.[4]

PetroEdge's understanding as to whether the Pine PSA required completed and producing wells can more clearly be divined from the information it conveyed to Statoil when it sold the Marcellus mineral rights (along with other assets). PetroEdge informed Pine that it had sold its interest in the Marcellus mineral rights of the Langley tract to Statoil in late 2012. Statoil and PetroEdge entered into a Purchase and Sale Agreement (Statoil PSA) on October 12, 2012. (Tr. Ex. 55.) A July 31, 2012 email from Rob Owen of PetroEdge to Dick McCann and Lindsay Hamminga of Statoil stated that PetroEdge "satisfied the first drilling obligation [in the Pine PSA] by drilling the Bumgardner 5-2H Well," and noted that the well was not yet completed. (Tr. Ex. 15.) Schedule 3.25 of the Statoil PSA, entitled "Unfulfilled Drilling Obligations," similarly notes that "[t]he first drilling obligation satisfied by drilling the Bumgardner #5-2H Well. Must drill at least two (2) additional wells, vertical or horizontal, on or before April 1, 2014 (may be negotiable). These wells must be drilled on the Langley tract or on a pooled unit in which the Langley tract has been pooled therewith." (Tr. Ex. 26.)

Mr. Heffelfinger testified that he was initially pleased by the transfer of the Marcellus mineral rights to Statoil, believing that a large company would have the resources to develop the property quickly. He and Mr. Rubin had difficulty communicating with anyone at Statoil from

---

[4] Mr. Heffelfinger stated that Mr. Richard verified that PetroEdge intended to complete the wells. As noted, the Court did not find Mr. Heffelfinger's testimony credible. Even if the conversation did take place as recounted by Mr. Heffelfinger, however, the Court notes that Mr. Richard did not indicate that he believed PetroEdge was contractually obligated to complete wells. A company entering into and performing under a contract related to the lease or conveyance of mineral rights might intend to develop the property without intending to be *contractually bound* to develop the property. In other words, PetroEdge's statements, if they occurred, could be construed as discussion of its optimistic goals for the Langley property and the Pine PSA, rather than its understanding that the contract required completed and producing wells regardless of future circumstances.

the outset, however. Their requests for a quarterly meeting, as required in the Pine PSA, went unanswered until they finally held a meeting by phone with Statoil representatives. Mr. Heffelfinger and Mr. Rubin sent several emails and letters, detailing their position regarding the contract and asserting that the failure to complete the first well and to begin drilling the second and third wells, as well as the failure to hold quarterly meetings, constituted a breach of contract.[5] Statoil denied a breach of contract, and ultimately brought this suit, seeking declaratory judgment.

Richard McCann of Statoil testified by deposition. Mr. McCann is the team leader for the Marcellus area in Appalachia, and was involved in Statoil's purchase of the PetroEdge assets, including the Marcellus mineral rights to the Langley tract. He explained that Statoil "found it impossible to justify drilling on [the Langley tract] for economic reasons" because Statoil had evaluated the area and concluded the wells would not be economically viable. (McCann Depo. at 35:1-9, att'd as Tr. Ex. 97.)[6] A reservoir engineering team leader at Statoil, Abhijeet Inamdar, also testified by deposition. (Inamdar Depo., att'd as Tr. Ex. 96.)[7] He reviewed and confirmed the findings of a report, entitled the Evaluation of Arc of Isolation Acreage (Tr. Ex. 13), with respect to the reserves analysis. That report concluded that the Langley tract was within an area with relatively low reserves where production would not be profitable. Mr. Inamdar confirmed

---

[5] The Court notes that Statoil objected to the introduction of many communications between Pine and Statoil in which the parties laid out positions and began discussing possible resolution under Rule 408 of the Federal Rules of Evidence. Because the Court finds the content of the communications to be of little relevance, no ruling is necessary; the emails simply confirm Mr. Heffelfinger's account of continuous efforts to communicate with Statoil. However, as the Court stated during trial, those exhibits that contain references to settlement or informal resolution of the alleged breach are inadmissible under Rule 408.

[6] Statoil objected to the inclusion of portions of Mr. McCann's testimony for inclusion of settlement negotiations under Rule 408. The Court finds that the objection should be sustained, and the Court will not consider Page 33:7 – 34:2, 35:14 – 36:6, 36:7 – 36:24, or 51:9 – 52:1.

[7] Pine objects to Mr. Inamdar's testimony on the grounds that he did not submit a written expert report and did not create the Arc of Isolation exhibit. He testified that updating and reviewing reserves information on an ongoing basis was within the usual scope of his job duties at Statoil. The Court finds Mr. Inamdar's testimony appropriate as an employee of the company to the extent he provided his analysis of the Arc of Isolation to Statoil and contributed to Statoil's knowledge and decisions regarding that information.

that his review of the report, together with his own calculations and updates to the numbers, supported the report's findings with respect to reserves, although he did not replicate the economic analysis based on the reserve estimates.

Statoil did not take any steps to complete the Bumgardner 5-2H well or to begin drilling any additional wells on the Langley tract. It sold its interest in the Pine Marcellus mineral rights in 2015.

## CONCLUSIONS OF LAW

Courts considering contract cases must first determine as a matter of law whether the contract is ambiguous. *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court.") The Court previously held that the Pine PSA is ambiguous with respect to whether production is required. When contract language is ambiguous, courts may consider extrinsic evidence to determine the intent of the parties. *Estate of Tawney v. Columbia Natural Res., LLC*, 633 S.E.2d 22, 30, footnote 5 (W. Va. 2006) (quoting from *Watson v. Buckhannon River Coal Co.*, 95 W. Va. 164, 120 S.E. 390 (1923)). When a contract is ambiguous, "parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given the contract by the parties themselves either contemporaneously or subsequently." Syl. Pt. 4, *Watson v. Buckhannon River Coal Co.*, 120 S.E. 390 (W.Va. 1923).

The Pine PSA required the Purchaser to spud three wells within a set time period, a provision that was designed to promote development of the Langley tract. The Court does not take lightly that a finding that production was not required under the contract leaves Pine with no

remedy for Statoil's breach of the contract by failing to spud two of the wells. Nonetheless, the Court concludes that the preponderance of the evidence demonstrates that the contract did not require production.

The absence of an explicit production requirement, while not dispositive alone given the general purpose of the Pine PSA, is quite significant under these circumstances. A production requirement in a sale or lease of mineral rights is far from standard.[8] As Mr. Heffelfinger himself stated: "No oil and gas agreement, no lease says you have to complete a well." (Tr. at 146:18-22) (but insisting that completion was required here because the Pine PSA would otherwise be meaningless.) Thus, one would expect such an unusual provision to be explicitly stated.

In addition, it is clear from both the contract and Mr. Heffelfinger's testimony regarding the formation of the contract that the terms were carefully and thoroughly negotiated between the parties and their counsel, although PetroEdge drafted the contract. For example, Section 5.8 governs abandonment and restoration of wells by requiring the Purchaser to offer a well to the seller before plugging and restoring the well and site. If the seller chooses to take over the well and continue operation, the seller is responsible for plugging the well and restoring the site; if the seller declines, the Purchaser remains responsible for abandonment costs and procedures. Section 5.9 contains the 18% ORRI. The parties negotiated a provision for the ORRI to expire when 90% of the reserves of a well have been produced, with a detailed arbitration procedure to determine whether that 90% threshold has been achieved in case of disagreement between the parties. In short, the parties and their counsel anticipated potential issues and drafted provisions to guide

---

8 This circumstance stands in contrast to the issue initially considered by this Court on which the Fourth Circuit reversed. It is the norm for rights and obligations in a contract to extend to successors and assigns. (*See* 4CCA Opinion at 16) (noting the "general rule that a successors and assigns provision places a successor or assign in the shoes of its predecessor or assignor with respect to the rights and duties given to the latter under the relevant contract.")

resolution.

Mr. Heffelfinger's testimony hints at some issues related to a production requirement that sophisticated, experienced parties would have anticipated. He testified that the Purchaser would be entitled to delay production based on gas prices or economic conditions. He admitted that the Pine PSA does not tell the Purchaser how to produce or require a particular type of well. The Pine PSA also contains no deadline by which production must begin, nor does it detail any method of ascertaining damages or lost royalties for failure to produce. It is simply not credible to suggest that sophisticated, counseled parties with decades of experience in the oil and gas industry intended to require production in a contract conveying mineral rights, but neglected to include contract language detailing the above terms.[9]

Finally, the parties' actions subsequent to the enactment of the Pine PSA demonstrate that the spudding requirement did not imply a production requirement. PetroEdge and Pine negotiated an extension of the spudding deadline in return for $100,000 in consideration. That extension did not reference a related production requirement or suggest that the consideration was in return for a delay in production, as well as a delay in spudding the well. More directly, PetroEdge informed Statoil in multiple communications that the Bumgardner 5-2H well, which had been spud onto the Langley tract, but was not complete, satisfied the first drilling requirement. PetroEdge at no point

---

9 Questions regarding conditions under which the Purchaser could defer production, the type of well required, and when production would be expected to begin, demonstrate the difficulty that this Court would have if it found an implied production requirement. Given that Mr. Heffelfinger stated that there could be circumstances under which production would not be required, the Court would have to not only find an implied production requirement, but draft a contract paragraph with related terms and conditions – which is clearly forbidden by the most basic rules of contract interpretation. Moreover, the terms, as applicable to this case, are not clear. There is significant evidence that Statoil declined to drill wells or produce minerals because it determined that doing so would not be economical; Mr. Heffelfinger testified that the Purchaser could defer production based on economic conditions. Without contract language to apply, it is unclear how the Court could evaluate whether Statoil was required to produce despite its determination that doing so would not be profitable.

informed Statoil that it was contractually required to bring the Bumgardner 5-2H into production. Thus, the Court finds that PetroEdge understood the Pine PSA to require wells to be spud, but not completed or producing, and believed the obligation as to the first well was satisfied when the Bumgardner 5-2H well was spud on the Langley tract.

Accordingly, having carefully considered the contract language, the purpose and intent of the contract, the parties' testimony, and the actions of Pine and PetroEdge under the contract, the Court concludes that the Pine PSA does not require production. Pine's evidence of damages is based entirely on royalty losses. Therefore, Pine has not demonstrated that it suffered any damages as a result of Statoil's failure to spud the second and third wells, and Statoil is entitled to judgment in its favor.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court finds that Pine has failed to demonstrate any damages resulting from Statoil's breach of the Pine PSA, and Pine's breach of contract claim, therefore, fails. The Court **ORDERS** that judgment be entered in favor of Statoil.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: February 14, 2018

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA